**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **ANTWAN HAYWOOD CURTIS,** | * | |
|     **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-20-1903** |
| | * | |
| **DPSCS,** | | |
| **WARDEN CASEY CAMPBELL,** | * | |
| **LT. BILAL AHMED,** | | |
| **WEXFORD HEALTH SOURCE, INC.** | * | |
| **WARDEN RICHARD R. GRAHAM, JR.** | | |
| | * | |
|     **Defendants.** | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION**

Plaintiff Antwan Haywood Curtis brought this civil action against Defendants Maryland Department of Public Safety and Correctional Services ("DPSCS"), Warden Casey Campbell, Lieutenant Bilal Ahmed, Warden Richard R. Graham, Jr., and Wexford Health Source, Inc. ("Wexford"), alleging violations of the Eighth Amendment to the United States Constitution, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. ECF No. 1; ECF No. 1-2. Pending before the Court is a Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment filed by Defendants DPSCS, Campbell, Ahmed, and Graham ("State Defendants"). ECF No. 12. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, Defendants' Motion shall be granted, in part, and denied, in part. Additionally, the Court dismisses the Complaint as to Defendant Wexford pursuant to 28 U.S.C. § 1915 for failure to state a claim.

## I.      BACKGROUND

### A.      Factual Background

Plaintiff is an inmate committed to the custody of the Maryland Division of Corrections and is currently confined to Western Correctional Institution ("WCI") in Cumberland, Maryland. ECF No. 1 at 1.[1] Plaintiff, proceeding *pro se*, filed the Complaint at issue here in connection with two separate falls, one at Jessup Correctional Institution ("JCI") and the other at Roxbury Correctional Institution ("RCI"). *Id.* at 3–4. According to Plaintiff, Defendants' failure to provide Plaintiff with a cell that included the features necessary to accommodate his disability while housed at JCI and their failure to provide a ramp in the shower area at RCI caused Plaintiff's falls and his resulting injuries. *See id.*; ECF No. 1-2 at 2–3. At all times relevant to Plaintiff's allegations, Plaintiff used a wheelchair. ECF No. 1-2 at 1.

### 1.      JCI Incident

According to Defendants, Plaintiff was primarily housed in a single cell while at JCI but was moved to Administrative Segregation Pending Adjustment ("ASPA") on July 2, 2018, where he remained until September 13, 2018, when he was transferred to RCI. ECF No. 12-1 at 2–3; ECF No. 12-4 (traffic history). Plaintiff was moved to ASPA due to reports that he had been bullying other inmates while housed in JCI's F-building, C-tier, which is the designated housing area for handicapped inmates. ECF No. 12-5 at 1, 4–5 (Decl. Lt. Bilal Ahmed and Attachments). Defendant Ahmed investigated the reports and, based on the information he uncovered, recommended that Plaintiff be transferred to another facility for security reasons. *Id.* at 2.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Defendant Ahmed also recommended that Plaintiff be moved to ASPA in the interim.[2] *Id.* at 4. However, in his capacity as a Lieutenant with the Internal Investigation Division ("IID"), Defendant Ahmed does "not have any role in case management, classification, medical, or the housing of inmates" nor was he aware of any injuries Plaintiff sustained while at JCI. *Id.* at 2.

On August 6, 2018, while confined to his cell in ASPA, Plaintiff fell to the floor while attempting to "use the bathroom." ECF No. 1 at 3. As a result of the fall, Plaintiff injured his left pinky finger. *Id*. Plaintiff states that there was a medical order in place at that time requiring his confinement to a "single handicap cell[,]" but he was instead placed in a regular single cell, which "was not a qualified handicapped cell." *Id*. at 4. Plaintiff claims that Defendant Campbell knew of his medical requirements but did not ensure he was housed appropriately. *Id*. at 3–4.

 Medical records generated while Plaintiff was at JCI indicate that he was seen for an unscheduled sick call visit on August 6, 2018, to address his claim that he fell and hurt his finger. ECF No. 12-6 at 2. The nursing comments indicate that Plaintiff's finger was "minimally swollen and painful with pain scale of 6/10[.]" *Id*. Plaintiff was provided with an ice pack and Motrin, and he was instructed to return the following morning for a possible x-ray of the finger. *Id*.

On August 13, 2018, a radiologist read the x-ray performed on August 7, 2018.  ECF No. 12-6 at 13–14.  The x-ray showed a "nondisplaced fracture across the shaft of the 5th metacarpal." *Id*. at 14. Plaintiff's finger was "immobilized with splint and ace wrap application." *Id*. at 13.

---

[2] Defendant Ahmed's investigative report indicates that, on May 11, 2018, Plaintiff received a notice of infraction for "masturbating while a female Officer was conducting a formal count on the tier" and that, on July 3, 2018, accusations were made against Plaintiff concerning an alleged PREA, Prison Rape Elimination Act, incident involving another inmate. ECF No. 12-5 at 3. As part of his investigation, Defendant Ahmed spoke with other inmates who confirmed that Plaintiff was bullying other inmates and that the accusations against him were true. *Id*. at 4. Defendant Ahmed then recommended that Plaintiff not be allowed to "reenter the JCI compound in General Population." *Id*.

On August 22, 2018, Plaintiff filed an Administrative Remedy Procedure complaint ("ARP") regarding the August 6, 2018 fall at JCI. ECF No. 12-12 at 5. Plaintiff complained that this was the second time he had fallen in the cell he had occupied since July 2, 2018. *Id*. Plaintiff stated that he was "not suppose[d] to be in this cell . . . because it [doesn't] have any grab bars[,]" and he is an "inmate with disabilities" and is wheelchair bound. *Id*. at 7. He stated that he cannot walk without a walker and that federal law prohibits discrimination against people with disabilities. *Id*. Plaintiff alleged that his cell assignment violated the ADA, asked to be transferred to RCI, and sought an award of $200 per day for each day he was assigned to the cell. *Id*. Defendant Campbell dismissed the ARP because there was "no evidence to substantiate [Plaintiff's] claim that staff ha[d] violated any policy or procedures" and because Plaintiff failed to provide any documentation indicating he required grab bars inside his cell. *Id*. at 8.

Plaintiff appealed the dismissal of the ARP to the Commissioner of Correction, where it was again dismissed. ECF No. 12-12 at 2–3. The Commissioner's response noted that the "latest medical order indicated 'Single Cell for six months.'" *Id.* Plaintiff appealed the Commissioner's response to the Inmate Grievance Office ("IGO"), and the matter was referred to the Maryland Office of Administrative Hearings. ECF No. 12-13 at 3–10. After a hearing on the complaint, the Administrative Law Judge ("ALJ") found that Plaintiff had failed to prove that the Division of Corrections "acted in an arbitrary and capricious manner or acted inconsistently with the law by not following applicable laws, regulations, policy or procedures" and therefore did not address Plaintiff's injuries or his claim for damages since Plaintiff failed to prove his claim. *Id*. at 10.

Plaintiff states that on September 13, 2018, Defendant Campbell transferred him from JCI to RCI, an allegedly non-handicap prison, ECF No. 1 at 4; ECF No. 14 at 2. Defendant Campbell, however, states that in his capacity as warden of both JCI and RCI "[i]t is beyond the

scope of [his] job duties and responsibilities to assign housing or classify inmates into any housing unit." ECF No. 12-7 at 2. Defendant Campbell further states that he "was not involved in nor did [he] interfere with the housing unit assignments or in transferring" Plaintiff while he was at JCI or RCI. *Id.*

### 2.    RCI Incident

Plaintiff was medically assessed after his transfer to RCI and that assessment noted that Plaintiff was "[m]obility impaired" and used a wheelchair.[3] ECF No. 12-6 at 81. The medical assessment gave Plaintiff a Karnofsky Score of 90%, *id.*, meaning that he is "[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature[.]" *Performance Scales: Karnofsky & ECOG Scores*, OncologyPro, https://oncologypro.esmo.org/oncology-in-practice/practice-tools/performance-scales; *Karnofsky Performance Status Scale Definitions Rating (%) Criteria*, National Palliative Care Research Center, http://www.npcrc.org/files/news/karnofsky_performance_scale.pdf ("Able to carry on normal activity[.]"); *see also Karnofsky Performance Status*, National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/karnofsky-performance-status ("The Karnofsky Performance Status scores range from 0 to 100. A higher score means the patient is better able to carry out daily activities.").[4] Plaintiff was provided with a walker and a

---

[3] Plaintiff had surgery on his right ankle on October 3, 2017, for a torn ligament and closed fracture. ECF No. 12-6 at 98. On April 17, 2019, he reported to the surgeon that he was unable to walk. *Id.* Plaintiff attributed the weakness in his right leg to a MRSA infection he developed after the surgery. *Id.* at 99. Examination revealed that Curtis's entire right leg was weak, leading the doctor to suspect an issue with his lumbar spine. *Id.*

[4] Pursuant to Fed. R. Evid. 201(b)(1), "[t]he [C]ourt may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

wheelchair and approved for a "Lower Bunk Only" assignment.[5] ECF No. 12-6 at 80. The restrictions on Plaintiff's housing were "Temporary." *Id*.

On September 21, 2018, Plaintiff saw a chronic care doctor at RCI, Dr. Choudry, regarding Plaintiff's various medical issues, including his left-hand injury as well as his mobility issues. ECF No. 12-6 at 59. Dr. Choudry reviewed Plaintiff's neurology consult report and noted that there was no evidence of myopathy or neuropathy but there was a possibility Plaintiff had "mild radiculopathy of L4-L5[.]" *Id.* He further noted that Plaintiff had an ankle brace, and it was unclear why his ankle buckles. *Id.* Finally, Dr. Choudry noted that Plaintiff needed physical therapy. *Id.* A plan was made to allow Plaintiff's left hand to heal for 8–12 weeks and then repeat x-rays. *Id.* If his finger healed, Plaintiff would be switched to crutches because the wheelchair "will only make his muscles weaker and atrophy." *Id*.

On March 6, 2019, Plaintiff tripped on "the shower partition on the floor" while exiting the shower and states that he injured his ribs as a result. ECF No. 1 at 4. Plaintiff explains that he was unable to get into the shower area while in his wheelchair "due to the partition." *Id*. The day after his fall, Plaintiff was seen by Mary Ellen Bryan, RN for a headache and soreness from the fall. ECF No. 12-8 at 17. She noted that Plaintiff had no complaints of chest pain or respiratory distress and that he had no open wounds or lacerations. *Id.*

Plaintiff filed an ARP on March 19, 2019 regarding his March 6, 2019 fall. *Id.* at 2. Plaintiff stated that Officer Bible, who was working on the tier at the time, called medical for assistance after Plaintiff fell. *Id*. Plaintiff claimed that, since the fall, he had been in "constant pain on [his] left[ ]side making it difficult to take deep breaths" and interfering with his ability to sleep. *Id*. He expressed concern that he had broken his ribs, *id.*, and stated that he is "in a

---

[5] Plaintiff was housed in a double cell while at RCI. ECF No. 12-4 (traffic history).

wheelchair for what may be the rest of [his] life[,]" *id*. at 3. He asserted that RCI "must have wheelchair accessible ramps in the shower area" and blamed his injury on the absence of the same. *Id.*

Defendant Campbell dismissed Plaintiff's ARP after Lieutenant Newlin investigated the claim. ECF No. 12-8 at 2. Lieutenant Newlin interviewed Officer Bible as well as four inmates that Plaintiff named as witnesses to his fall. *Id*. at 3–5. Officer Bible stated that he asked Plaintiff if he was okay after he fell and Plaintiff indicated he was, but also said he wanted to go to the dispensary for medical attention. *Id*. at 11. Inmate Gary Stephenson provided a written statement indicating that he had seen Plaintiff get in and out of the shower without any problems on numerous occasions, but that one day Plaintiff fell. *Id*. at 10. Stephenson added that the fall "did not look real" and he thought Plaintiff faked it. *Id*. Inmate James Lewis did not actually witness the fall; rather, he saw Plaintiff on the floor near the shower, which he observed from the "Rec hall." *Id*. at 12. Inmate Leroy Alston also did not witness Plaintiff's fall. *Id*. at 13. Inmate Craig Gissentaner simply stated that Plaintiff fell when he came out of the shower. *Id*. at 14. Inmate Adriel Neal said he saw Plaintiff fall, it did not look like he was faking it, and it looked to him like Plaintiff was hurt. *Id*. at 15.

Defendant Campbell's April 24, 2019 response to the ARP states that:

> Your request for administrative remedy has been investigated and is dismissed. In your ARP request you state that you fell and injured yourself in the shower because RCI did not accommodate your disability and because of that you want wheelchair ramps and a seat available for every shower. RCI made reasonable accommodations to afford you your own time to shower. You were immediately sent to medical where records show you were treated and no significant injury was noted. Witnesses to this incident in HU1 have given conflicting reports. Lastly, you were accommodated with showers in ASIA until your transfer to WCI. No further action will be taken through the ARP process.

ECF No. 12-8 at 2.

Plaintiff appealed Defendant Campbell's dismissal of Plaintiff's ARP to the

Commissioner of Correction. ECF No. 12-8 at 21–23. The appeal was denied because, in

pertinent part:

> Supporting documentation revealed you transferred to RCI [on] 9/13/2018 and
> [it] is verified by statements in your complaint. This is the first complaint you
> filed inquiring about accommodations at RCI.  In accordance with COMAR
> 12.02.28.09.B "An inmate seeking formal resolution of a complaint under this
> chapter, as soon as possible . . . the date the inmate first had knowledge of the
> incident . . . ."  Finally, documentation revealed you were transferred to WCI
> on 3/12/19.

ECF No. 12-8 at 23 (ellipses in original).  Plaintiff appealed the Commissioner's response to the

IGO where it was dismissed as moot because he had been transferred to WCI. ECF 12-13 at 16.

### 3.  WCI housing assignment

Plaintiff was transferred from RCI to WCI on March 12, 2019, where he was assigned to

a single cell. ECF No. 12-9 at 2. Plaintiff complains that at WCI he is "forced to reside in an

unqualified 'single handicapped cell.'" ECF No. 1 at 4.

Plaintiff was again medically screened on March 22, 2019, after he arrived at WCI. ECF

No. 12-6 at 74–75.  At that time, it was noted that Plaintiff has right-sided weakness and uses a

wheelchair. *Id*. Plaintiff refused the offer of a walker to assist him and a wheelchair was issued to

him for distance movement. *Id*. at 74. Plaintiff was also assigned to a lower bunk, lower tier. *Id*.

However, the restrictions on Plaintiff's housing assignment and the issuance of a wheelchair

were temporary and set to be removed on September 22, 2019. *Id*.

The housing unit where Plaintiff is currently assigned, Housing Unit 1, D-Tier, is

equipped with a shower containing grab bars and a seat in compliance with sections 609 and

610.3 of the 2010 ADA Standards for Accessible Design. ECF No. 12-10 at 1. Additionally,

Plaintiff's cell contains grab bars around the toilet, is equipped with a sink designed for

accommodation of obstructed reach, and the bunk has been placed on the back wall to allow for turning space inside the cell. *Id*. at 1–2. Both the bunk height and the toilet seat height are compliant with section 604.4 of the 2010 ADA Standards for Accessible Design. *Id*.

Like Defendant Campbell, Defendant Graham states that in his capacity as warden at WCI, it is beyond the scope of his duties and responsibilities to assign housing or classify inmates into any housing unit. ECF No. 12-11 at 1. Further, Defendant Graham's responsibilities do not include the administration of medical care for inmates assigned to WCI. *Id*. Defendant Graham indicates that Plaintiff did not contact his office to request any housing accommodations related to his disability. *Id*. at 2.

On August 3, 2019, Plaintiff filed an ARP complaining about a delay in providing him with an MRI that had been ordered by medical staff to determine if his leg weakness was caused by an issue with his lumbar spine. ECF No. 12-14 at 6. The ARP was dismissed on September 13, 2019, because Plaintiff received the MRI on August 6, 2019, and the delay in scheduling it was due to transportation issues. *Id*. at 2. Plaintiff did not, however, complain about the lack of accommodations in his cell or housing unit at WCI.

## B.    Plaintiff's Claims

Plaintiff states that he has a serious medical condition for which he is entitled to receive proper care and housing. ECF No. 1-2 at 2. He asserts that the failure to provide accommodations for his housing at JCI and for the use of the shower at RCI has resulted in irreparable physical and emotional harm. *Id*. According to Plaintiff, the failure to provide adequate accommodations for his disability constitutes a violation of his Eighth Amendment rights and violates the ADA as well as the Rehabilitation Act. *Id*. at 3.  Plaintiff states that Defendants Campbell, Graham, and Ahmed are "employees of the State of [Maryland] . . . and

[]are responsible [for] provid[ing] protection, safety and special housing, showers, etc. to handicapped prisoners, [and] thus [are] working under color of [S]tate law." *Id*. at 2. Plaintiff alleges that Defendant Wexford, as a medical care contractor charged with providing Maryland prisoners with medical care, had employees who "were working under color of law." *Id*. As relief, Plaintiff seeks monetary damages as well as injunctive relief requiring the Division of Corrections to "have qualified handicapped celling" in JCI, RCI, and WCI. ECF No. 1 at 5.

### C.    Procedural History

Plaintiff initiated this civil action on June 23, 2020, ECF No. 1, and filed a Motion for Leave to Proceed *in Forma Pauperis* on the same day, ECF No. 2. The Court granted Plaintiff's Motion for Leave to Proceed *in Forma Pauperis* on August 14, 2020. ECF No. 4. State Defendants filed the instant Motion to Dismiss or, in the Alternative, for Summary Judgment on January 4, 2021, ECF No. 12, and the Court mailed a Rule 12/56 notice to Plaintiff on the same day, ECF No. 13. Plaintiff responded in opposition on January 19, 2021, ECF No. 14,[6] and filed a supplement to his Opposition on January 25, 2021, ECF No. 15.

---

[6] In his Opposition, Plaintiff asks the Court to appoint him counsel. ECF No. 14-1 at 1. For the following reasons, the Court grants Plaintiff's request.

A court's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one; however, courts typically grant such requests when the *pro se* litigant has shown that "his case is one of exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it[.]" *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (quoting *Gordan v. Leeke*, 574 F.2d 1147, 1173 (4th Cir. 1978)), *abrogated on other grounds by Mallard v. U.S. Dist. Ct. for S.D. Iowa*, 490 U.S. 296, 298 (1989). While there is no comprehensive definition of exceptional circumstances, "[t]he existence of such circumstances will turn on the quality of two basic factors—the type and complexity of the case, and the abilities of the individuals bringing it." *Id.* (internal quotation marks omitted) (citing *Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982)).

Following the Court's decision herein, this action will proceed to discovery. Considering (1) Plaintiff's largely ineffective response to State Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, *see* ECF No. 14; (2) Plaintiff's statement that due to the COVID-19 Pandemic, he is "locked-down" 23 hours a day without access to the records he needs, ECF No. 14-1 at 1; (3) Plaintiff's statement that he does not have access to the library or phone, ECF No. 14 at 2; and (4) Plaintiff's claim that he has been unable to reach anyone that is willing and able to help him present his claim, ECF No. 14-1 at 1, the Court finds Plaintiff will require assistance in completing discovery. Moreover. Plaintiff's remaining claim turns on whether Defendants' reasonably accommodated Plaintiff's disability and will likely require an extensive review of his medical records, depositions of treatment providers, and

## II.      STANDARD OF REVIEW

### A.      Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")).

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint[,]" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any

---

potential expert testimony. Plaintiff has presented a colorable claim that he likely cannot successfully advance *pro se*, and thus the Court finds that appointment of counsel is warranted.

reference to actual events, *see United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

However, where, as here, the plaintiff is proceeding *pro se*, the Court reads the pleadings generously. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At the same time, the Court must also fulfill its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks and citation omitted).

### B.    Motion for Summary Judgment

If the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. When the moving party styles its motion as a Motion to Dismiss or, in the Alternative, for Summary Judgment, as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" Fed. R. Civ. P. 56(c), show that there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when the nonmovant has not had the opportunity to discover information that is essential to his opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (internal citation and quotation marks omitted). To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery "could possibly create a genuine issue of material fact sufficient . . . to survive

13

summary judgment, or otherwise affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015) (internal citation and quotation marks omitted).

### C.    Dismissal under 28 U.S.C. § 1915

Finally, the *in forma pauperis* statute authorizes district courts "at any time" to dismiss a case where the Complaint fails to state a claim on which relief may be granted, or if the claim is frivolous, malicious, or seeks monetary relief against a defendant who is immune from suit. 28 U.S.C. § 1915(e)(2)(B); *see also Jenkins v. Tillbrook*, No. PX-18-565, 2018 WL 1570259, at * 1 (D. Md. Mar. 30, 2018). Thus, since Plaintiff is proceeding *in forma pauperis* in the instant action, the Court is not limited to considering only the arguments presented in Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Where the Court assesses whether a Complaint should be dismissed under § 1915(e)(2)(B), the standards are "the same as those for reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6)." *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016) (internal citations and quotation marks omitted).

## III.   DISCUSSION

The Court construes Plaintiff's Complaint as presenting three claims against Defendants DPSCS, Campbell, Ahmed, Graham, and Wexford: (1) a § 1983 claim for Defendants' alleged violations of the Eighth Amendment; (2) a Title II ADA claim pursuant to 42 U.S.C. § 12132; and (3) a Section 504 Rehabilitation Act claim pursuant to 29 U.S.C. § 794.[7] These claims are based on the alleged conditions of Plaintiff's confinement at three separate correctional facilities: (1) the placement of Plaintiff "in a single (regular population . . .) cell which was not a qualified

---

[7] "The ADA and the Rehabilitation Act do not expressly provide for a private right of action. But, it is well established that private parties may sue to enforce Title II of the ADA and the Rehabilitation Act." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 371 (D. Md. 2011) (citing, *inter alia*, *Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002)).

14

handicapped cell" while Plaintiff was an inmate at JCI, resulting in Plaintiff's August 6, 2018 fall and injury; (2) the lack of a ramp into the shower at RCI, resulting in Plaintiff's March 6, 2019 fall and injury; and (3) Plaintiff's confinement to "an unqualified 'single handicapped cell'" at WCI. ECF No. 1 at 3–4. Plaintiff seeks both damages and injunctive relief based on these claims. *Id.* at 5.

Below, the Court will first address administrative exhaustion. Second, the Court will address the appropriateness of injunctive relief. Third, the Court will determine against which Defendants Plaintiff has properly brought claims. Fourth, and finally, the Court will evaluate the merits of each claim. Ultimately, the Court holds that only Plaintiff's Section 504 Rehabilitation Act claim, to the extent it is brought against Defendant DPSCS based on the Plaintiff's conditions of confinement at JCI and RCI, survives State Defendants' Motion.

### A.  Exhaustion of Administrative Remedies

State Defendants assert, and Plaintiff fails to refute, that the Court should dismiss Plaintiff's claims, to the extent they are based on his confinement  to "an unqualified 'single handicapped cell'" at WCI, for non-exhaustion pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. ECF No. 12-1 at 14–17. Specifically, State Defendants argue that, prior to filing his Complaint, Plaintiff did not exhaust his administrative remedies with respect to his claim that his housing at WCI is not suitable for someone who is disabled. *Id.* Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215–216 (2007).

The Prisoner Litigation Reform Act provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court[.]" *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]"). Additionally, an inmate must complete the prison's internal appeals process before bringing suit. *See Jones*, 549 U.S. at 202–03 (noting the PLRA requires prisoners to exhaust prison grievance procedures before filing suit); *see also Mitchell v. Bishop*, No. PX-18-933, 2019 WL 4059902, at *4 (D. Md. Aug. 28, 2019) ("Nor can [the plaintiff] save the claims by exhausting administrative remedies while this case is pending."). A claim that has not been exhausted may not be considered in court—*i.e.*, "exhaustion is mandatory." *Jones*, 549 U.S. at 211; *see also Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion[.]" (quoting *Miller v. French*, 530 U.S. 327, 337 (2000)) (ellipsis in original)).

Here, Plaintiff exhausted administrative remedies with respect to his claims regarding conditions at JCI and RCI prior to filing suit, *see* ECF No. 12-8; ECF No. 12-12, ECF No. 12-13,

but he did not complete the process regarding his complaints about the cell to which he is assigned at WCI. The only ARP Plaintiff filed while at WCI relates to an MRI scan, not his present complaint that he is confined to an unqualified single handicapped cell at WCI. *See* ECF No. 12-14. Thus, to the extent Plaintiff's claims are based on the conditions of Plaintiff's confinement at WCI, those claims are dismissed for failure to exhaust administrative remedies and Defendant Graham, who is not involved in the claims related to JCI or RCI, is dismissed from this case.

### B.   Injunctive Relief

The Court next considers whether Plaintiff's claims seeking injunctive relief are moot. While State Defendants do not raise the issue, "[m]ootness is a jurisdictional question and thus may be raised *sua sponte* by a federal court at any stage of proceedings." *United States v. Spring*, 715 F.3d 535, 540 (4th Cir. 2013) (citing *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for the purposes of Article III purposes—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive or declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009)); *see also Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007) (holding that "the supervening event of [a prisoner's] release from the [unit]" mooted his claim for an injunction prohibiting the enforcement of a publications ban). The release or transfer of an inmate removes him from "the environment in which he is subjected to the challenged policy or practice," thereby freeing him "of the policy or practice that provoked his lawsuit in the first place." *Incumma*, 507 F.3d at 287.

No longer suffering an injury, the plaintiff thus ceases to possess "a legally cognizable interest in a judicial decision on the merits of his claim" and the claim for injunctive relief is moot. *Id.*; *see also Already, LLC*, 568 U.S. at 91 (stating a case is moot when "parties lack a legally cognizable interest in the outcome").

Here, it is undisputed that Plaintiff is no longer incarcerated at JCI nor at RCI, the facilities which allegedly failed to provide proper accommodations to inmates with disabilities.[8] Plaintiff's transfer from those facilities thus freed Plaintiff from the conditions that triggered the initiation of this action. While an order requiring RCI and JCI to provide "qualified handicapped celling[,]" ECF No. 1 at 5, might benefit other disabled inmates, Plaintiff would not reap the benefits of the injunction, as he is no longer incarcerated at JCI or RCI, nor would the injunction remedy any past injury. Thus, Plaintiff's claims, in so far as they request injunctive relief, are dismissed as moot. *See Taylor v. Riverside Reg'l Jail Auth.*, No. 3:11CV456, 2011 WL 6024499, at *3–5 (E.D. Va. Dec. 2, 2011) (finding that the plaintiff's request for injunctive relief in the form of an order "enjoining Riverside to adequately accommodate deaf prisoners" was moot because the plaintiff was no longer incarcerated at Riverside).

C.   **Proper Defendants**

1.   **§ 1983 Claim for Violations of Plaintiff's Eighth Amendment Rights**

State Defendants argue that Plaintiff's § 1983 claim should be dismissed as to Defendant DPSCS and Defendants Campbell and Ahmed in their official capacity because they are immune under the Eleventh Amendment. ECF No. 12-1 at 28–29. The Court agrees.

Under the Eleventh Amendment, a State, including its agencies and departments, is immune from suit brought by its citizens or the citizens of another state in Federal court without

---

[8] The Court has already dismissed Plaintiff's claims based on the conditions of confinement at WCI. *See supra* § III.A.

the State's consent. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The

Fourth Circuit has recognized three exceptions to the Eleventh Amendment:

> First, Congress may abrogate the States' Eleventh Amendment immunity when it
> both unequivocally intends to do so and acts pursuant to a valid grant of
> constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356,
> 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective
> injunctive relief against state officials acting in violation of federal law. *Frew ex
> rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free
> to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides
> v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

*See Hyde v. Md. State Bd. of Dental Exam'rs*, No. ELH-16-02489, 2017 WL 2908998, at *6 (D.

Md. July 7, 2017) (ellipses in original) (quoting *Lee-Thomas v. Prince George's Cty. Pub. Sch.*,

666 F.3d 244, 249 (4th Cir. 2012)).

None of these exceptions are applicable to Plaintiff's § 1983 claim against DPSCS—an

agency of the State of Maryland, *see Dep't of Pub. Safety & Corr. Servs. v. Doe*, 94 A.3d 791,

794 n.2 (Md. 2014) (stating that DPSCS is "an agency of the State")—for violations of

Plaintiff's Eighth Amendment Rights. First, Congress has not abrogated Eleventh Amendment

immunity for constitutional claims brought pursuant to 42 U.S.C. § 1983, such as Plaintiff's

Eighth Amendment claim against State Defendants. *See Borkowski v. Balt. Cty., Md.*, 492 F.

Supp. 3d 454, 469 (D. Md. 2020) (holding that state entities are immune from claims under 42

U.S.C. § 1983); *Smothers v. Maryland*, No. DKC 18-3451, 2019 WL 3323215, at *2 (D. Md.

July 24, 2019) ("Congress did not abrogate States' Eleventh Amendment immunity for claims

arising under 42 U.S.C. § . . . 1983"). Second, Plaintiff's claims for injunctive relief have been

dismissed as moot. *See supra* § III.B. Third, while the State of Maryland has waived its

sovereign immunity for certain types of cases brought in state courts, *see, e.g.*, Md. Code Ann.,

State Gov't § 12-104, it has not waived its immunity under the Eleventh Amendment for all suits

in federal court. *See Pennhurst*, 465 U.S. at 99 n.9 ("[A] State's waiver of sovereign immunity in

19

its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts.");
*Weller v. Dept. of Soc. Servs. for City of Balt.*, 901 F.2d 387, 397 (4th Cir. 1990).

Claims against State defendants acting in their official capacities are similarly barred by
the Eleventh Amendment. *See Ballenger v. Owens*, 352 F.3d 842, 845 (4th Cir. 2003) ("[F]or
purposes of the Eleventh Amendment, a state official acting in his official capacity is protected
from a damages action by the same immunity [as the State]."); *see also Brandon v. Holt*, 469
U.S. 464, 471–72 (1985) ("[A] judgment against a public servant 'in his official capacity'
imposes liability on the entity that he represents.") (citation omitted). Therefore, all claims
pursuant to § 1983 against DPSCS and the individual State Defendants in their official capacities
are dismissed.

### 2.    ADA Claim

In addition to his § 1983 claim, Plaintiff alleges claims against Defendants under Title II
of the ADA. However, State Defendants argue that the individual State Defendants are not
subject to liability under the ADA because Title II of the ADA applies only to public entities.
ECF No. 12-1 at 24. The Court agrees, and additionally finds that this argument is equally
applicable to Defendant Wexford.

Title II of the ADA prohibits discrimination by a "public entity[.]" 42 U.S.C. § 12132.
The ADA defines "public entity" as "any State or local government[,]" or "any department,
agency, special purpose district, or other instrumentality of a State or States or local
government[.]" 42 U.S.C. § 12131(1)(A)–(B). "By its plain language, this definition does not
include private individuals or private entities." *Wright v. Carroll Cty. Bd. of Educ.*, No. ELH-11-
3103, 2013 WL 4525309, at *19 (D. Md. Aug. 16, 2013) (internal quotation marks and citations
omitted). Thus, Plaintiff's ADA claims against the individual State Defendants fail, *see Adams v.*

20

*Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 395 (D. Md. 2011) (explaining that the

ADA definition of public entity "does not include individual persons"); *Pathways Psychosocial*

*v. Town of Leonardtown, Md.*, 133 F. Supp. 2d 772, 780 (D. Md. 2001) (same), as do Plaintiff's

claims against Defendant Wexford, *see Green v. New York*, 465 F. 3d 65, 79 (2d Cir. 2006)

(concluding that a private hospital was not a "public entity" for purposes of the ADA because

"[a] private hospital performing services pursuant to a contract with a municipality even if does

so according to the municipality's rules and under its direction, is not a creature of any

governmental entity[,]" and "[i]nstead, it is a parallel private entity").[9]

### 3.    Rehabilitation Act Claim

Plaintiff also brings a claim against Defendants under the Rehabilitation Act, 29 U.S.C.

§ 794. This claim likewise fails to the extent it is brought against the individual State Defendants

and Defendant Wexford.[10]

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, under which the Court finds

Plaintiff's claim to be brought, applies to a "program or activity receiving Federal financial

assistance." 29 U.S.C. § 794(a). Even if DPSCS and the correctional institutions for which

DPSCS is responsible receive federal financial assistance, the employees of DPSCS, including

the individual State Defendants, and the medical care contractor used by DPSCS, Defendant

Wexford, do not fall into the scope of § 504. *See Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d

Cir. 2002) (per curiam) (holding that disabled college student failed to state a claim under the

Rehabilitation Act against individual defendants employed by the college, or college's outside

---

[9] State Defendants also argue that DPSCS and the individual State Defendants in their official capacity are immune from Plaintiff's ADA under the Eleventh Amendment. ECF No. 12-1 at 21–23. The Court agrees but will address this argument below after it discusses the viability of Plaintiff's § 1983 Eighth Amendment claim. *See infra* § III.D.2.c.

[10] The Court addresses this issue *sua sponte* pursuant to its authority under 28 U.S.C. § 1915(e)(2)(B).

legal counsel, because those parties "d[id] not receive federal aid"). "As the Fourth Circuit [has] explained . . . , nothing in the language or legislative history of the [Rehabilitation] Act indicates a congressional intention to reach the indirect beneficiaries of federal assistance who benefit by virtue of business dealings." *Wright*, 2013 WL 4525309, at *20 (internal quotation marks omitted) (quoting *Disabled in Action v. Mayor & City of Balt.*, 685 F.2d 881 (4th Cir. 1982), *abrogated on other grounds by Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268 (4th Cir. 2002)). Thus, Plaintiff's Rehabilitation Act claim is dismissed as to the individual State Defendants and Defendant Wexford.

**D.    Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6) and/or Summary Judgment Under Fed. R. Civ. P. 56**

**1.    § 1983 Claim for Violations of Plaintiff's Eighth Amendment Rights**

As the Court understands Plaintiff's § 1983 claim, Plaintiff alleges that he "had[] a serious medical condition for which he was entitled to proper care and housing." ECF No. 1-2 at 2. Defendants, including Defendant Campbell and Ahmed, "were[] responsible [for] provid[ing] protection, safety and special housing, showers, etc. to handicapped prisoners[.]" *Id.* However, Defendants repeatedly placed "Plaintiff in inadequate-unsafe-unqualified housing[,]" which caused Plaintiff harm. *Id.* at 1. And, finally, this conduct was in violation of the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* at 1–2. The Court will first discuss what is required for a plaintiff to succeed on an Eighth Amendment claim and then will determine whether Plaintiff's allegations are sufficient to support a claim as to: (1) Defendant Wexford; (2) Defendant Campbell; and (3) Defendant Ahmed.[11]

---

[11] The Court dismissed Plaintiff's § 1983 claim as to DPSCS and Defendant Graham above. *See supra* §§ III.A, III.C.1.

22

a.        **Eighth Amendment Claims Under § 1983**

The Eighth Amendment, as incorporated against the states by the Fourteenth

Amendment, *see Robinson v. California*, 370 U.S. 660, 666 (1962), prohibits the infliction of

"cruel and unusual punishments[.]" U.S. Const. amend. VIII. This prohibition, however,

"proscribes more than physically barbarous punishments[,]" *Estelle v. Gamble*, 429 U.S. 97, 102

(1976), it also imposes a duty on prison officials to "provide humane conditions of confinement

. . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care," *Farmer*

*v. Brennan*, 511 U.S. 825, 832 (1994).[12] Thus, a prison official's "deliberate indifference to

serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain

proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal quotation marks and

citations omitted).

To succeed on a claim that he has been subjected to unconstitutional conditions of

confinement, a prisoner must satisfy the Supreme Court's two-pronged test set forth in *Farmer v.*

*Brennan*, 511 U.S. 825. Under the first prong of the *Farmer* test, the "objective" prong, a

plaintiff must demonstrate that "the deprivation alleged [is], objectively, 'sufficiently serious[.]'"

*Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A deprivation is

"sufficiently serious" when it is extreme. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.

2003). "In order to demonstrate such an extreme deprivation, a prisoner must allege a serious or

significant physical or emotional injury resulting from the challenged conditions or demonstrate

a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged

conditions." *Id.* (internal quotation marks and citations omitted). Specifically, in denial of

---

[12] It is worthy of note, however, that "[i]t is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994).

medical care cases, like the instant case, the plaintiff must demonstrate "that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need." *Haskins v. Wexford Health Sources, Inc.*, No. JKB-12-3116, 2013 WL 3146932, at *2 (D. Md. June 17, 2013). A serious medical need is a medical need that has been acknowledged by a physician as mandating treatment or is so obvious that even a lay person would recognize the necessity of treatment. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017).

Under the second prong of the *Farmer* test, the "subjective" prong, a plaintiff must show that the prison officials acted with a "sufficiently culpable state of mind[.]" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). "In conditions of confinement cases, the requisite state of mind is deliberate indifference." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). To establish deliberate indifference, a plaintiff must show that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. "In deliberate indifference to medical needs cases, *Farmer*'s subjective prong requires proof of the official's 'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.'" *Scinto*, 841 F.3d at 226 (alteration in original) (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). "Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 225 (internal quotations and brackets omitted). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Makdessi v. Fields*, 789 F.3d 126, 133

(4th Cir. 2015)). However, even officials who acted with deliberate indifference may be "free from liability if they responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

### b.      Defendant Wexford

Even construing Plaintiff's pleadings liberally, Plaintiff has not sufficiently alleged a § 1983 claim against Defendant Wexford. Plaintiff's only allegations concerning Defendant Wexford state that Defendant Wexford is the "employer of medical personnel at JCI, RCI, and WCI who []were working at the time of [Plaintiff's] injuries" and "was contracted by the State of Maryland to work in JCI, RCI, and WCI and provide prisoners with medical care[.]" ECF No. 1-2 at 2. These allegations fall far short of what is required to state a § 1983 claim upon which relief can be granted.

First, Plaintiff's § 1983 Eighth Amendment claim is based on Defendants' alleged failure to provide special housing with suitable modifications to accommodate Plaintiff's disability, not Defendants' inadequate provision of medical treatment. Thus, it is unclear how Defendant Wexford, whose responsibilities are unrelated to housing, is connected to Plaintiff's § 1983 claim—or indeed any of Plaintiff's claims. Accordingly, such a claim is not properly brought against Defendant Wexford and the Court dismisses Plaintiff's § 1983 Eighth Amendment claim, to the extent that claim is brought against Defendant Wexford, on this ground.

Second, even if the conduct of Defendant Wexford's personnel did have some connection to the Eighth Amendment violations Plaintiff alleges, Plaintiff cannot hold Defendant Wexford liable under § 1983 for the conduct of its employees. Such a theory of liability—*i.e.* respondeat superior liability—is inapplicable in the context of a complaint filed pursuant to 42 U.S.C. § 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (stating that "there is no respondeat superior liability under § 1983"). In other words, Defendant Wexford is not liable

under § 1983 for actions allegedly committed by its employees when such liability is predicated

solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715,

727–28 (4th Cir. 1999). Plaintiff's § 1983 claim against Defendant Wexford is dismissed on this

ground as well.

### c.   Defendant Ahmed

Plaintiff's § 1983 claim against Defendant Ahmed also cannot survive State Defendants'

Motion. First, Plaintiff's Complaint is devoid of any specific allegations regarding Defendant

Ahmed's role in denying Plaintiff reasonable housing accommodations at JCI.[13] *See* ECF No. 1.

Additionally, in a declaration attached to State Defendants' Motion, Defendant Ahmed states that

he is a "Lieutenant with the Department of Public Safety & Correctional Services, Intelligence &

Investigative Division ("IID")" and that, in his capacity as a Lieutenant with IID, he "received

and investigated complaints that [Plaintiff] had been bullying another inmate while housed at

JCI[.]" ECF No. 12-5 at 1. Based on Defendant Ahmed's investigation of the complaints against

Plaintiff, Defendant Ahmed "reported and *recommended* that [Plaintiff] be transferred to another

facility for security reasons." *Id.* at 2 (emphasis added). Defendant Ahmed also *recommended*

that Plaintiff be placed in ASPA until arrangements for Plaintiff's transfer could be made. *Id.* at

4. Defendant Ahmed states in his declaration, however, that he does "not have any role in case

management, classification, medical, or the housing of inmates." *Id.* at 2. This statement, sworn

under penalty of perjury, directly contradicts one of the inferences upon which Plaintiff's Eighth

Amendment claim relies: that Defendant Ahmed placed Plaintiff in housing that did not

accommodate his handicapped status, ECF No. 1-2 at 1. Defendant Ahmed's statement that he

---

[13] The Court assumes for the sake of deciding this motion that Plaintiff bases his § 1983 Eighth Amendment claim against Defendant Ahmed only on the conditions of confinement at JCI, since Plaintiff only alleges that Defendant Ahmed worked at JCI, not RCI or WCI. *See* ECF No. 1 at 2.

did not have a role in the logistics of Plaintiff's housing is supported by the Administrative

Segregation Investigative Report attached to Defendant Ahmed's declaration—which indicates

that numerous other prison officials, including a case manager and a case manager supervisor,

were contacted regarding Defendant's Ahmed's recommendation that Plaintiff be placed in

ASPA—and by the Notice of Assignment to Administrative Segregation, also attached to

Defendant Ahmed's Declaration—which informed Plaintiff of his ability to meet with the case

management team to discuss his placement, including reasons why he should not be placed in

ASPA. ECF No. 12-5 at 4. Plaintiff does not provide any evidence contesting Defendant

Ahmed's declaration or its attachments. Thus, State Defendants have set forth an undisputed

material fact—*i.e.*, that Defendant Ahmed did not have a role in placing Plaintiff in a non-

handicap cell—that is fatal to Plaintiff's § 1983 Eighth Amendment claim against Defendant

Ahmed.[14] Summary Judgment is therefore granted in Defendant Ahmed's favor as to Plaintiff's

§ 1983 claims against him.

### d.    Defendant Campbell

Defendant Campbell was the warden at JCI at the time of Plaintiff's August 2018 fall and

the warden at RCI during the time of Plaintiff's March 2019 fall. ECF No. 12-7 at 1. Thus, the

Court interprets Plaintiff's claims against Defendant Campbell as relating to Plaintiff's

conditions of confinement at both of those institutions. The Court discusses Plaintiff's § 1983

Eighth Amendment claim as it relates to each facility separately below.

---

[14] Moreover, to the extent the problematic conduct at issue is Defendant Ahmed's recommendation that Plaintiff be moved to ASPA pending his transfer, Plaintiff has not set forth allegations or evidence that Defendant Ahmed knew of the risk to Plaintiff of recommending him for ASPA—*i.e.*, Plaintiff did not allege nor present evidence that Defendant Ahmed knew that Plaintiff would be put in an non-handicap accessible cell upon his transfer to ASPA. *Scinto*, 841 F.3d at 226 ("In deliberate indifference to medical needs cases, *Farmer's* subjective prong requires proof of the official's 'actual subjective knowledge of both the inmate's serious medical condition *and the excessive risk posed by [the official's] action or inaction.*'" (emphasis added) (quoting *Jackson*, 775 F.3d at 178)).

i.     JCI

Plaintiff's JCI-related § 1983 claim against Defendant Campbell, like the claim against Defendant Ahmed, cannot survive State Defendants' Motion. First, like Defendant Ahmed, Defendant Campbell has sworn under penalty of perjury that "[i]t is beyond the scope of [his] job duties and responsibilities to assign housing or classify inmates into any housing unit." ECF No. 12-7 at 2. Defendant Campbell also states that he "was not involved in nor did [he] interfere with the housing unit assignments or in transferring [Plaintiff] while at either JCI or RCI." *Id.* This testimony contradicts Plaintiff's allegation that Defendant Campbell placed him into a regular population cell despite the medical order requiring a single handicap cell. Plaintiff has not set forth evidence disputing Defendant Campbell's declaration nor does he request additional discovery. Thus, the Court finds, based on the undisputed fact that Defendant Campbell was not responsible for the housing placement of Plaintiff while at JCI, that Defendant Campbell did not violate any of Plaintiff's Eighth Amendment rights and cannot be held directly liable for any such violations that allegedly occurred.

However, in his Opposition, Plaintiff sets forth another theory of liability, that Defendant Campbell "hindered [Plaintiff's] condition and put [Plaintiff's] life in harm[s] way, when he allow[ed] his officers . . . to deny or violate [Plaintiff's] medical order by not having [Plaintiff] in a handicap accessible cell[.]" ECF No. 14 at 1. To the extent this allegation is a claim of respondeat superior liability, such claims are unavailable under § 1983. *See supra* III.D.1.b; *see also Love-Lane*, 355 F.3d at 782 ("[T]here is no respondeat superior liability under § 1983."). Under § 1983, the liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional

28

injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, to establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

 The Court finds that Defendant Campbell is not liable for any Eighth Amendment violations that may have occurred at JCI under a theory of supervisory liability. Due to Defendant Campbell's uncontested testimony that he had no role or involvement in Plaintiff's housing and that Plaintiff had not written his office "requesting any housing accommodations related to any alleged disability . . . prior to [the] alleged injury[,]" it is unreasonable to infer that, prior to Plaintiff's August 6, 2018 fall and the resulting ARP, Defendant Campbell knew about Plaintiff's allegedly improper housing.[15] ECF No. 12-7 at 1–2. Thus, Plaintiff cannot establish the first element of supervisory liability, and the Court grants summary judgment in Defendant Campbell's favor as to Plaintiff's § 1983 claim based on Plaintiff's conditions of confinement at JCI.[16]

---

[15] Defendant Campbell did have notice that Plaintiff was transferred to ASPA, *see* ECF No. 12-5 at 4, but there are no allegations or evidence supporting a finding that this knowledge translated into knowledge that Plaintiff's cell in ASPA was not handicap accessible.

[16] The Court also notes that, by the time Plaintiff filed his ARP on August 22, 2018 complaining that he fell due to a lack of grab bars in his cell, ECF No. 12-12 at 6–7, JCI personnel had installed grab bars, ECF No. 12-12 at 3 ("I [am] suppose[d] to have grab bar in my cell[,] they c[a]me and put them in there on 8-17-18[.]"). The deficiency Plaintiff complained of had been fixed. While not dispositive since the fix happened after the injury complained of, this fact lends support to a finding that Defendant Campbell was not deliberately indifferent to or in tacit

###### ii.      RCI

Plaintiff's § 1983 claim, to the extent it is based on the conditions of confinement at RCI, also cannot withstand State Defendants' Motion. First, to the extent Plaintiff's § 1983 claim is based on Defendant Campbell transferring Plaintiff to RCI from JCI, Defendant Campbell has set forth a sworn declaration stating that he "was not involved . . . in transferring [Plaintiff] while at either JCI or RCI[.]" ECF No. 12-7 at 2. This statement contradicts Plaintiff's allegation that Defendant Campbell was responsible for his transfer; but, in his Opposition, Plaintiff does not contest Defendant Campbell's statement or request additional discovery on the issue. Thus, the Court finds, based on the undisputed material fact that Defendant Campbell was not responsible for the transfer of Plaintiff to RCI, an allegedly "non-handicap prison[,]" ECF No. 14 at 2, that Defendant Campbell did not directly violate any of Plaintiff's Eighth Amendment rights and cannot be held directly liable under § 1983.

Second, even if Defendant Campbell had been responsible for Plaintiff's transfer to RCI, an allegedly non-handicap accessible prison, State Defendants present uncontested evidence that Plaintiff did not have a serious medical need at the time Plaintiff was transferred, or, at the very least, Defendant Campbell would not have known of Plaintiff's serious medical need at the time Plaintiff was transferred. Plaintiff's medical assignment to a single handicap cell and Plaintiff's wheelchair use was temporary; the accommodations permitted by the medical order Plaintiff references in his Complaint were to be terminated on August 31, 2018, ECF No. 12-12 at 9, before Plaintiff's transfer to RCI on September 13, 2018, ECF No. 1 at 4. This medical order was signed by a medical provider. ECF No. 12-12 at 9. Thus, according to the available documentation, Plaintiff was transferred to RCI after he no longer needed special housing

---

authorization of the alleged offense practice and thus not liable under a theory of supervisory liability. *See Shaw*, 13 F.3d at 799.

accommodations—*i.e.*, after Plaintiff no longer had a known serious medical need. Consequently, Plaintiff's direct § 1983 claim for deliberate indifference to serious medical need against Defendant Campbell based on his transfer to RCI cannot survive State Defendants' Motion for Summary Judgment.

Third, to the extent Plaintiff's § 1983 Eighth Amendment claim against Defendant Campbell is based on a theory of supervisory liability, State Defendants present uncontested evidence that refutes the first element Plaintiff needs to prove to establish liability. As discussed above, to establish supervisory liability under § 1983, a plaintiff must show that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff. *See Shaw*, 13 F.3d at 799. With respect to this first element, State Defendants attach to their Motion a sworn declaration by Defendant Campbell stating that Plaintiff "did not write [Defendant Campbell's] office as Warden requesting any housing accommodations related to any alleged disability at . . . RCI prior to [the March 2019] injury." ECF No. 12-7 at 2. Additionally, none of Plaintiff's medical documents from after Plaintiff's transfer to RCI indicate that Plaintiff needed any special housing accommodation other than a lower bunk. See ECF No. 12-6 at 74, 79, 80. Plaintiff has not contested Defendant Campbell's declaration, nor has he asked for additional discovery. This undisputed evidence negates any allegation that Defendant Campbell had actual or constructive knowledge of the unreasonable risk to Plaintiff prior to Plaintiff's fall and subsequent ARP.

Moreover, even if the Court infers that Defendant Campbell knew RCI's showers were not suitable for prisoners confined to a wheelchair, State Defendants present uncontested evidence that Plaintiff was not so confined while at RCI, or, at least that, despite the presence of

a wheelchair, Defendant Campbell would not have known Plaintiff's wheelchair was a necessity such that Plaintiff could not safely step over a shower partition. Upon Plaintiff's arrival at RCI, a health care provider completed a Medical/Mental Health Report stating that Plaintiff "may have [a] walker and wheelchair" and that he could only be assigned to a lower bunk. ECF No. 12-6 at 79. However, these restrictions were only in place until the September 30, 2018, *id.*, over five months before Plaintiff's March 6, 2019 fall. Additionally, the health care provider gave Plaintiff a Karnofsky Score of 90%, ECF No. 12-6 at 81, meaning that he was ambulatory, *see supra* § I.A.2. Another Medical/Mental Health Report was completed for Plaintiff on September 25, 2018, which stated that Plaintiff would be allowed a wheelchair and a walker for three months but did not specify any special housing accommodations. ECF No. 12-6 at 77. Again, these limited accommodations were set to terminate months before Plaintiff's fall. *Id.* Finally, Plaintiff's medical records, which State Defendants provide, indicate that Plaintiff's chronic care doctor thought a wheelchair was causing Plaintiff's muscles to get weaker and recommended that he switch to crutches as soon as [Plaintiff's] hand healed, 8–12 weeks after September 21, 2019. ECF No. 12-6 at 59.[17] Plaintiff does not dispute any of this evidence or request additional discovery. This medical history refutes any allegation that Defendant Campbell had actual knowledge of the unreasonable risk that the absence of shower ramps posed to Plaintiff prior to Plaintiff's fall and subsequent ARP. Thus, State Defendants have provided undisputed evidence that Plaintiff cannot establish the first element of a supervisory liability claim against Defendant Campbell based on Plaintiff's fall while incarcerated at RCI.[18]

---

[17] Additionally, less than three weeks after Plaintiff's fall, a third Medical/Mental Health Report was completed, stating that Plaintiff was only permitted to use a wheelchair when out of the housing unit for a distance and otherwise stated that Plaintiff should use a walker, which Plaintiff refused. ECF No. 12-6 at 74.

[18] The Court also notes that State Defendants have presented evidence that, after Plaintiff fell out of the shower, RCI personnel accommodated Plaintiff's needs by showering Plaintiff at medical, ECF No. 12-8 at 3, and that Plaintiff was subsequently transferred to WCI where his accommodations, including the showers, are in ADA compliance,

Therefore, Plaintiff's § 1983 claim against Defendant Campbell based on the conditions of confinement at RCI cannot survive State Defendants' Motion.

### 2.    ADA and Rehabilitation Act Claims

#### a.    Elements of ADA and Rehabilitation Act Claims

In his Complaint, Plaintiff alleges violations of Title II of the ADA and Section 504 of the Rehabilitation Act. "Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § 12132, prohibit discrimination against an otherwise qualified individual with a disability." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 (4th Cir. 1995) (footnotes omitted). In order to establish a claim under either of these statutes,[19] "a plaintiff must prove: (1) that he has a disability; (2) that he is otherwise qualified for the . . . benefit in question; and (3) that he was excluded from the . . . benefit due to discrimination solely on the basis of the disability." *Id.* at 1265.

As to the first element, a disability is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1) (defining disability for the purposes of the ADA); *see also* 29 U.S.C. § 705(20) (referencing the definition in 42 U.S.C. § 12102 to define disability for purposes of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and

---

ECF No. 12-10 at 1. Given Defendant Campbell did not know of the risk of harm to Plaintiff presented by RCI showers prior to Plaintiff's fall, State Defendants' evidence regarding RCI personnel's response after Plaintiff's fall, while not dispositive, weighs against any contention that Defendant Campbell was deliberately indifferent to or in tacit authorization of the alleged offensive conduct.

[19] "Because the language of the two statutes is substantially the same, we apply the same analysis to both." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995)

working." 42 U.S.C. § 12102(2). Therefore, in order to establish that he is disabled under both

the ADA and the Rehabilitation Act, Plaintiff must establish that: "he has a physical or mental

impairment; that this impairment implicates at least one major life activity; and the limitation is

substantial." *Spivey v. Dep't of Pub. Safety & Corr. Servs. State of Md.*, No. JFM-09-440, 2010

WL 3199342, at *2–3 (D. Md. Aug. 11, 2010) (citing *Heiko v. Columbo Savings Bank, F.S.B.*,

434 F.3d 249, 254 (4th Cir. 2006)).

As to the second element, an "otherwise qualified" individual is an individual "who, with

or without reasonable modifications to rules, policies, or practices, the removal of architectural,

communication, or transportation barriers, or the provision of auxiliary aids and services, meets

the essential eligibility requirements for the receipt of services or the participation in programs or

activities provided by a public entity." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 369

(D. Md. 2011) (internal quotation marks omitted) (quoting 42 U.S.C. § 12131(2)). A state

prisoner, such as Plaintiff, may be considered a qualified individual with disabilities, so as to

come within the protection of Title II and Section 504. *See Jarboe v. Md. Dept. of Pub. Safety &

Corr. Servs.*, No. ELH-12-572, 2013 WL 1010357, at *2 (D. Md. Mar. 13, 2013).

As to the third element, "[c]laims under Section 504 and Title II may be pursued under

three distinct grounds: '(1) intentional discrimination or disparate treatment; (2) disparate

impact; and (3) failure to make reasonable accommodations.'" *Brown v. Dep't of Pub. Safety &

Corr. Servs.*, 383 F. Supp. 3d 519, 552 (D. Md. 2019) (quoting *A Helping Hand, LLC v. Balt.

Cty.*, 515 F.3d 356, 362 (4th Cir. 2008)). Here Plaintiff's claims are based on Defendants'

alleged failure to make reasonable accommodations. "[W]hat constitutes reasonable

accommodations . . . is a question of fact and will vary according to the circumstances." *Id.*

(ellipsis in original and internal quotation marks omitted) (quoting *Seremeth v. Bd. of Cty.*

34

*Comm'rs Frederick Cty.*, 673 F.3d 333, 340 (4th Cir. 2012)).

>    **b.    Do Plaintiff's ADA and Rehabilitation Act Claims Survive?**

Giving Plaintiff's Complaint the liberal construction afforded to *pro se* plaintiffs, Plaintiff

has sufficiently stated claims under the ADA and the Rehabilitation Act that could survive a

motion to dismiss. Plaintiff alleges that he has a physical impairment that implicates a major life

activity, walking: "[Plaintiff's] previous s injuries debilitated [his] ability to walk and bound him

to a wheelchair." ECF No. 1-2 at 1; ECF No. 1 at 3. Plaintiff states that this physical impairment

is documented by medical orders assigning him to a "Single Handicap Cell" and a "Wheel

Chair[.]" ECF No. 1 at 4. Finally, Plaintiff states that, despite Defendants' duty "to provide

protection, safety and special housing, showers, etc. to handicapped prisoners[,]" ECF No. 1-2 at

2, Defendants failed to accommodate Plaintiff's disability when they (1) placed Plaintiff a non-

handicapped cell while at JCI, resulting in Plaintiff's fall and broken finger, and (2) failed to

provide handicap accessible showers while at RCI, resulting in Plaintiff's fall and injured ribs,

ECF No. 1 at 3–4.

However, State Defendants challenge the first element of the claim, arguing that

"Plaintiff is simply not a 'disabled' person within the contemplation of the ADA or the

Rehabilitation Act, nor is he regarded as such by prison authorities." ECF No. 12-1 at 21. As

stated above, a disability is "a physical or mental impairment that substantially limits one or

more major life activities of such individual[.]" 42 U.S.C. § 12102(1). The regulations

interpreting the meaning of "substantially limits" within the definition of a disability under the

ADA, state that "'substantially limits' shall be construed broadly in favor of expansive coverage,

to the maximum extent permitted by the terms of the ADA" and "'substantially limits' is not

meant to be a demanding term." 29 C.F.R. § 1630.2(j)(1). Moreover, the regulations state that

"[a]n impairment is a disability within the meaning of this section if it substantially limits the

ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*

Although Defendants argue Plaintiff does not have a disability and attach numerous documents to their Motion as evidence of that assertion, such evidence is at best ambiguous. Specifically, State Defendants attach multiple documents titled Medical Assignment or Medical/Mental Health Report for Inmate Assignments, and each of these documents list Plaintiff's confinement to a wheelchair and need for special housing accommodations as temporary. *See* ECF No. 12-6 at 74, 77–80; ECF No. 12-12 at 9, 10. Additionally, State Defendants attach a document titled Disability Assessment that indicates that, while Plaintiff is mobility impaired and needs a wheelchair, his Karnofsky Score is 90%. ECF No. 12-6 at 81. A Karnofsky Score of 90% indicates Plaintiff is ambulatory. *See supra* § I.A.2. Finally, State Defendants attach medical reports that indicate that, although Plaintiff's right foot frequently buckles and reportedly has impaired sensation, Plaintiff's chronic care doctor wanted Plaintiff to switch to crutches rather than a wheelchair because the wheelchair was increasing Plaintiff's muscle weakness. ECF No. 12-6 at 59. The evidence State Defendants present supports that Plaintiff has a physical impairment and that he consequently uses a wheelchair. While that evidence also provides some support to the contention that Plaintiff's physical impairment does not substantially limit his ability to walk or any other major life activity, the Court cannot make this conclusion as a matter of law. Thus, whether Plaintiff's impairment substantially limits his ability to walk as compared to most people in the general population is at a minimum a disputed issue.

State Defendants' Motion is denied as to Plaintiff's Section 504 Rehabilitation Act claim

against DPSCS.[20] However, the Court must still address State Defendants' Eleventh Amendment argument with respect to Plaintiff's ADA claim.[21]

> **c.      Is Plaintiff's ADA Claim Barred by the Eleventh Amendment?**

As discussed above, the Eleventh Amendment of the United States Constitution provides that states are immune from "any suit in law or equity, commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has held, however, that, when Congress acts pursuant to § 5 of the Fourteenth Amendment, it may abrogate the sovereign immunity of the State where Congress (1) "unequivocally expressed its intent to abrogate" the States' sovereign immunity in the statute at issue, and (2) "acted pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). As to the first requirement, the language of the ADA, states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United State from an action in Federal or State Court . . . for a violation of [the ADA,]" 42 U.S.C. § 12202 (footnote omitted), and the Supreme Court has held that this statement is a clear and unequivocal expression of congressional intent to abrogate sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). Therefore, the Court must determine whether Congress had the power to abrogate sovereign immunity for Title II ADA claims brought in the prison context.

In *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court considered this

---

[20] For reasons similar to those discussed in the context of Plaintiff's § 1983 claims against Defendants Ahmed and Campbell—*i.e.*, the undisputed evidence that Defendants Ahmed and Campbell were not directly responsibility for the alleged failure to accommodate Plaintiff's disability—Plaintiff's Rehabilitation Act claim, to the extent it is brought against Defendant Ahmed and Campbell in their official capacity, cannot survive State Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. *See supra* III.D.1.

[21] To the extent that DPSCS and the correctional institutions for which DPSCS is responsible accept federal funds and thus are subject to the Rehabilitation Act, *see* 29 U.S.C. § 794(a), DPSCS cannot claim Eleventh Amendment immunity from Plaintiff's Rehabilitation Act claims. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005) (holding that because it received federal funding "GMU waived its Eleventh Amendment immunity with respect to [the plaintiff's] claims for damages under § 504 of the Rehabilitation Act").

question, but only partially decided the issue. The Supreme Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159 (emphasis in original). The Supreme Court, however declined to decide whether the ADA validly abrogates sovereign immunity for claims in the prison context "premised on conduct that does *not* independently violate the Fourteenth Amendment." *Id.* (emphasis in original). Instead, the Supreme Court directed the lower courts to decide, on a claim-by-claim basis:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*

As to the first inquiry, this Court decided above that Plaintiff states a plausible ADA claim—*i.e.*, the placement of Plaintiff in a non-handicap accessible cell and the failure to provide handicap accessible showers violated Title II of the ADA. *See supra* § III.D.2.b.

As to the second inquiry, the Court determined above that Plaintiff's Eighth Amendment claim, as incorporated against the states by the Fourteenth Amendment, does not survive State Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. *See supra* § III.D.1. Nor has Plaintiff alleged any other constitutional violations. Thus, the misconduct at issue in Plaintiff's ADA claim does not also violate the Fourteenth Amendment.

However, as to the third inquiry—*i.e.*, "insofar as [Defendant's] misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid[,]" *United States v. Georgia*, 546 U.S. at 159—a more in-depth discussion is necessary.

Congress may abrogate a States' sovereign immunity when it does so pursuant to a valid

exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive

guarantees of that Amendment. *Id.* at 158–59. Section 5 of the Fourteenth Amendment

authorizes Congress to "remedy and to deter violation[s] of rights guaranteed [by the Fourteenth

Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not

itself forbidden by the Amendment's text." *Kimel*, 528 U.S. at 81. However, while Congress may

enact remedial and preventative measures pursuant to the Fourteenth Amendment, it "may not

work a substantive change in the governing law." *Tennessee v. Lane*, 541 U.S. at 519 (internal

quotation marks omitted). Thus, the Supreme Court applies the "congruence and proportionality"

test in order to determine whether Congress acted within the scope of its § 5 power. *City of

Boerne v. Flores*, 521 U.S. 507, 520 (1997). Under this test, a court must (1) "identify with some

precision the scope of the constitutional right at issue[,]" *Br. of Tr. of Univ. of Ala. v. Garrett*,

531 U.S. 356, 365 (2001); (2) "examine whether Congress identified a history and pattern of

unconstitutional . . . discrimination by the States against the disabled[,]" *id.* at 368; and (3) if so,

determine whether the statute is an appropriate, congruent, and proportional response to that

history and pattern of unconstitutional treatment, *id.* at 374.

     With respect to the first part of the "congruence and proportionality" test—scope of the

right at issue—the Fourth Circuit identifies the right at issue in an ADA suit in the prison context

as follows: "disabled people have a constitutional right not to be subject to arbitrary and

irrational exclusion from the services, programs, or benefits provided by the state." *Wessel v.

Glendening*, 306 F.3d 203, 210, *overruling recognized by Constantine v. Rectors & Visitors of

George Mason Univ.*, 411 F.3d 474, 486 n.8 (4th Cir. 2005).[22]

---

[22] *Constantine* stated that *Tennessee v. Lane* abrogated *Wessel* with respect to the second inquiry in the "congruence and proportionality" test—whether there has been a "pattern of unconstitutional conduct"—411 F.3d at 486 n.8, but this Court sees no reason why *Constantine* and *Tennessee v. Lane* would affect the accuracy of *Wessel*'s discussion

With respect to the second part of the "congruence and proportionality" test, the Supreme Court stated in *Tennessee v. Lane* "that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." 541 U.S. at 529. The Fourth Circuit then held in *Constantine* that this statement "settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services" and that "[t]his conclusion is sufficient to satisfy the historical inquiry into the harms sought to be addressed by Title II." 411 F.3d at 487.

Finally, with respect to the third part of the "congruence and proportionality" test, the Court must decide whether, given the scope of the right at issue and the history and pattern of unconstitutional conduct identified by Congress, Title II's abrogation of sovereign immunity is a "congruent and proportional" response to that history of unconstitutional conduct. This inquiry is made on a case-by-case basis and consequently is context specific. In regard to the prison context, which is the context for the instant action, the Supreme Court has recognized "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973). Furthermore, the rights afforded to prisoners are significantly limited by their incarceration: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Thus, the Court finds that, "[b]ased on the wide discretion states have traditionally exercised in the management of their prisons and the limited scope of most constitutional protections in the prison context, the

---

regarding the first inquiry in the "congruence and proportionality" test and its resulting articulation of the scope of the right at issue in ADA suits in the prison context.

40

abrogation of sovereign immunity in the context of state prisons for conduct which violates the ADA but does not violate the Fourteenth Amendment does not satisfy the requirement of proportionality and congruence." *Spencer v. Earley*, No. CMH-01-1578, 2007 U.S. Dist. LEXIS 98009, at \*27–\*28 (E.D. Va. Jan. 30, 2007); *see also Barnes v. Young*, 565 F. App'x 272, 273 (4th Cir. 2014) (unpublished) ("Under the Eleventh Amendment, States are immunized from suits brought in federal court, absent a waiver from the State or a clear, constitutionally permissible Congressional exercise of its power under the Fourteenth Amendment . . . . The ADA creates an exception to this prohibition, however, where the ADA violations at issue also violate the Fourteenth Amendment . . . . Because we affirm the district court's grant of summary judgment on [the plaintiff's] § 1983 claims, we conclude that [the plaintiff's] ADA claims are barred."). Thus, Plaintiff's ADA claims are barred by the Eleventh Amendment.

***

For the above-mentioned reasons, the Court denies State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 12, as to Plaintiff's Section 504 Rehabilitation claim, to the extent that claim is brought against Defendant DPSCS based on Plaintiff's conditions of confinement at JCI and RCI. The Court, however, grants State Defendants' Motion as to all other claims and all other State Defendants. Additionally, Plaintiff's Complaint is dismissed as to Defendant Wexford.

**IV.     CONCLUSION**

For the reasons discussed above, the Defendants' Motion to Dismiss, or in the

Alternative, for Summary Judgment is granted, in part, and denied, in part, and, pursuant to the

Court's authority under 28 U.S.C. § 1915, the Complaint as to Defendant Wexford shall be

dismissed without requiring a response.

A separate Order follows.


Date: <u>June    14, 2021</u>                                    /s/<u>                                        </u>
                                                                                GEORGE J. HAZEL
                                                                                United States District Judge